**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**Bridgeport Division**

IN RE:                                              CHAPTER 13

Johnny Ray Moore a/k/a Johnny R. Moore,

             DEBTOR                          CASE NO. 16-51133

Specialized Loan Servicing, LLC, as servicer for
Bank of New York Mellon f/k/a The Bank of New
York, as Trustee for the Certificateholders of
CWABS, Inc., Asset-Backed Certificates,
Series 2006-12,

             MOVANT

VS

Johnny Ray Moore a/k/a Johnny R. Moore,

             DEBTOR

Molly T. Whiton, TRUSTEE

             RESPONDENT

**REPLY TO DEBTOR'S OBJECTION TO CLAIM 12**

      Specialized Loan Servicing, LLC, as servicer for Bank of New York Mellon f/k/a The

Bank of New York, as Trustee for the Certificateholders of CWABS, Inc., Asset-Backed

Certificates, Series 2006-12 ("Creditor"), secured creditor in the above-referenced case, hereby

submits this Reply to Johnny Ray Moore aka Johnny R. Moore's ("Debtor") Objection to Claim

#12 (the "Objection") filed on March 27, 2017, and in support thereof, respectfully states as

follows:

**RELEVANT BACKGROUND**

    **A.**    **The Underlying Notes, Mortgages, Defaults and Bankruptcies**

1.  On May 26, 2006, Debtor obtained a mortgage loan in the amount of $248,000.00, relating to the property located at 73-75 Baldwin Street, Bridgeport, Connecticut 06607 (the "Property").[1]  A copy of the mortgage and endorsed note is annexed hereto as Exhibit A.

2.  On July 12, 2013, Debtor was approved for and received a Loan Modification with respect to the Property.    A copy of the Loan Modification Agreement is annexed hereto as Exhibit B.

3.  The Debtor subsequently defaulted on his obligation to repay the loan.

4.   On May 31, 2012, Debtor filed a petition under Chapter 11 of the United States Bankruptcy Code which converted to Chapter 7 on October 29, 2014.  On February 4, 2015 the discharge order was entered.  A copy of the discharge order is annexed hereto as Exhibit C.

5.  On August 24, 2016, the Debtor then filed a petition under Chapter 13 of the United States Bankruptcy Code with a bar date for Proofs of Claim of December 27, 2016.

6.  Creditor filed a proof of claim on December 27, 2016 on the claims register as claim 12-1.

7.  On March 27, 2017, the Debtor filed an Objection to Claim #14 arguing that Creditor does not possess a perfected security interest because of the Debtor's prior discharge order.

### ARGUMENT

### A.    Debtor's Discharge Does Not Void Creditor's Lien

8.  Debtor argues that his discharge voids Creditor's lien because Debtor received a discharge in the Chapter 7 case, however that is not how the discharge injunction operates under 11 U.S.C. §§ 524(a)(2) and 727(b).

9.  Section 524(a) of the Code provides:

---

[1] Creditor highlights that the Property appears to be an investment property of the Debtor as the Debtor has listed 15 Sachem Drive, Shelton, Connecticut as his primary residence.

(a) A discharge in a case under this title-(1) voids any judgment at any time obtained, *to the extent that such judgment is a determination of the personal liability of the debtor* . . . [and]
(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt *as a personal liability of the debtor* . . . .

11 U.S.C. § 524(a) (emphasis added).

10. Section 524(a)(2) only prevents enforcement of personal liability and acts only as a bar to the "commencement or continuation" of  acts or actions to collect a discharged debt "as a personal liability."

11. Debtor's arguments overlook the fundamental and firmly established principle of bankruptcy law that liens on real property and other secured interests pass through bankruptcy unaffected. *See Dewsnup v. Timm*, 112 S.Ct. 773, 778 (1992). While a bankruptcy discharge precludes a creditor from pursuing a deficiency judgment against the debtor personally, it leaves intact the secured creditor's right to pursue an action against the debtor *in rem*. *Id*.

12. Simply stated, while Debtor is not personally liable for discharged debts, a valid lien (i.e., a charge upon <u>specific property to secure payment of a debt</u>) that has not been avoided (i.e., made unenforceable) in the bankruptcy case will remain after the bankruptcy case.  Therefore, Creditor is permitted to enforce the lien to recover the Property secured by the lien.

13. Moreover, case law clearly indicates while a bankruptcy discharge eliminates a borrower's personal obligation with respect to the property, the Chapter 7 discharge does not eliminate a mortgage lender's lien on the property and a lender is still permitted to proceed with its in rem rights with respect to the Property if timely payments are not made.  *See* 11 U.S.C. § 727(b); *Johnson v. Home State Bank*, 501 U.S. 78, 80 (1991).  Here, this is exactly what Creditor

is doing as the Debtor filed for bankruptcy a second time and included this property as part of his bankruptcy estate.

14. Further, it is clear that while the Code provides a discharge of personal liability for debt, it does not discharge the debtor's post-petition burdens of owning property such as insurance and taxes. *In re Arsenault*, 456 B.R. 627, 631 (Bankr. S.D. Ga. 2011).

15. The general rule that a bankruptcy filing by a borrower does not affect the enforceability of a security interest in collateral has been part of U.S. bankruptcy jurisprudence for well over a century. *See Long v. Bullard*, 117 U.S. 617 (1886); *accord Dewsnup v. Timm*, 502 U.S. 410, 417 (1992) ("the creditor's lien stays with the real property until the foreclosure"); *Farrey v. Sanderfoot*, 500 U.S. 291, 297 (1991) ("Ordinarily, liens and other secured interests survive bankruptcy."); *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991) ("[A] bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another—namely, an action against the debtor *in rem*.").

16. Further, the caselaw (*In re: Mclean v. Greenpoint Credit, LLC*, 515 B.R. 841, 846 (M.D. Ala. 2014) cited by the Debtor is inapposite to the instant action as that case pertained to an unsecured loan. The creditor in *McLean* was an unsecured creditor who held a deficiency judgment on the debtor's mobile home in the debtors' first chapter 7 bankruptcy. Two and a half years after the debtors obtained a discharge in that case, they filed a chapter 13 bankruptcy and the creditor filed an unsecured deficiency claim on the same deficiency judgment that had been discharged in the earlier case. Here, as explained above, this loan is a secured loan and the lien carries through the bankruptcy.

17. Accordingly, there is no evidence and no showing made that Creditor is seeking to enforce any debt as to personal liability, because it is not in fact. Consequently there is no showing of any actual or threatened violation of the discharge injunction.

### B.        Due Process Requires an Adversary Proceeding filed to Void or Value liens

18. The Debtor has concluded, incorrectly, that he could transform Creditor's liens into an unsecured and dischargeable claims merely by scheduling the mortgage debt as partially unsecured in the bankruptcy petition in bankruptcy case 12-51027. Due process requires that a debtor who seeks to invalidate a lien may do so only by filing an adversary proceeding. *See Cen-Pen Corp v. Hanson,* 58 F. 3d 89 (4th Cir. 1995); Fed. R. B. Proc. 7001 (2).

19. In both bankruptcy filings, case 12-51027 and 16-51133, the Debtor has yet to file an adversary proceeding related Creditor's lien that attempts to value or treat these claims and accordingly Creditor's lien is valid.

20. Additionally, it is well understood that 11 U.S.C. § 524 does not provide for a private right of action for a discharge injunction violation. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d at 421 (analyzing the legislative history of § 524, contrasting § 524 with Congress' choice in § 362(h) to create private causes of action for violations of bankruptcy stays, and concluding § 524 does not impliedly create a private right of action)); *Walls v. Wells Fargo Bank NA*, 276 F.3d 502, 509 (9th Cir. 2002) (tracking and adopting *Pertuso*'s analysis); and *Cox v. Zale Del. Inc.*, 239 F.3d 910, 917 (7th Cir. 2001) (agreeing with the result in *Pertuso* and concluding that a contempt action in the bankruptcy court that issued the discharge is the only relief available to remedy alleged § 524 violations); *In re Joubert*, 411 F.3d 452, 456 (3d Cir. 2005) (adopting the reasoning of *Pertuso, Walls* and *Cox* in the context of § 506(b) post-petition assessment of fees); *see also, Bessette v. Avco Fin. Servs. Inc.*, 230 F.3d 439, 444-45 (1st Cir. 2000) (refusing to

address whether § 524 implies a right of action, because, in the First Circuit's view, a bankruptcy court's contempt power under § 105(a) offers sufficient remedies).

## <u>CONCLUSION</u>

Wherefore, for the foregoing reasons, Creditor respectfully requests that this Honorable Court deny Debtor's Objection and allow for the claims to remain valid.

Dated: April 24, 2017
      New York, New York

**LEOPOLD & ASSOCIATES, PLLC**

By: *<u>/s/ Michael Rozea</u>*
    Michael Rozea, Esq.
    Attorneys for Movant
    80 Business Park Drive
    Armonk, NY 10504
    mrozea@leopoldassociates.com
    Phone: 914-219-5787 x 140
    Fed Bar ID# ct29256

# EXHIBIT A

Prepared by: ROMAN ALVAREZ

LOAN #: ████████

# INTEREST ONLY ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MAY 26, 2006                    BRIDGEPORT                    CONNECTICUT
   [Date]                         [City]                        [State]

73-75 BALDWIN STREET, BRIDGEPORT, CT 06607
[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 248,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of .. 10.875 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will make a payment on the first        day of every month, beginning on  JULY 01, 2006        .
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay Principal and interest by making a payment every month as provided below.
I will make my monthly payments of Principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note.
Each monthly payment will be applied as of its scheduled due date, and if the payment includes both Principal and interest, it will be applied to interest before Principal. If, on  JUNE 01, 2036        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.
### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 2,247.50        . This amount may change.
### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first        day of JUNE, 2008        , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.


J.R.M.

Case 6:16-13333 Claim 12-1 Part 2 Filed 12/27/16 Desc Exhibit 11 Page 2 of 9

LOAN #: ▉▉▉▉▉▉

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SEVEN & THREE-EIGHTHS percentage point(s) ( 7.375 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.375 % or less than 10.875 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 17.875 % or less than 10.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both Principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be the first monthly payment date after the sixtieth (60th) scheduled monthly payment.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment without paying any penalty. If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full or a Partial Prepayment at any time. However,

☐ I may prepay this Note in full at any time without penalty.

☒ If within the first TWELVE months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of Principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

J.R.M.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Johnny Ray Moore_ (signature)

JOHNNY RAY MOORE                              -Borrower

_____ -Borrower

PAY TO THE ORDER OF
WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS INC

BY _____ -Borrower
David A. Spector
Managing Director

_____ -Borrower

*[Sign Original Only]*

019009

06992    0323

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
ROMAN ALVAREZ

_____[Space Above This Line For Recording Data]_____

[Doc ID #]

# OPEN-END MORTGAGE DEED
MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  MAY 26, 2006          , together with all Riders to this document.
**(B) "Borrower"** is
JOHNNY RAY MOORE

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK                    . Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613                  .
**(E) "Note"** means the promissory note signed by Borrower and dated  MAY 26, 2006        . The Note states that Borrower owes Lender
TWO HUNDRED FORTY EIGHT THOUSAND and 00/100

Dollars (U.S. $ 248,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  JUNE 01, 2036            .

**CONNECTICUT-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**

Page 1 of 11

-6A(CT) (0005)    CHL (08/05)(d)    VMP Mortgage Solutions, Inc. (800)521-7291              **Form 3007  1/01**
CONV/VA


J.R.m.

DOC ID #:

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY of FAIRFIELD :

[Type of Recording Jurisdiction]    [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 3511 83    which currently has the address of
73-75 BALDWIN STREET, BRIDGEPORT    ,
[Street/City]
Connecticut    06607    ("Property Address"):
[Zip Code]

DOC ID #: ▮▮▮▮▮▮▮▮▮

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.



DOC ID #: ▮

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Borrower waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

J.R.M.

DOC ID #:

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

DOC ID #: ▓▓▓▓▓▓▓▓▓

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:



Case 16-51333 Doc 158-12 Filed 04/24/17 Entered 04/24/17 15:30:11 Page 17 of 44
Case 16-51333 Doc Claim 12-1 Part 2 Filed 12/27/16 Desc Exhibit 1 Page 20 of 44

06992    0329

DOC ID #: ███████████

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

J.R.M.

DOC ID #:

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

J.R.M.

DOC ID #:

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires a connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any

06992   0332

DOC ID #:

Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
Alison Larouie                            JOHNNY RAY MOORE                    -Borrower

_____          _____ (Seal)
Dania Sutton                                                                 -Borrower

                                          _____ (Seal)
                                                                             -Borrower

                                          _____ (Seal)
                                                                             -Borrower

J.R.M.

06992    0333

DOC ID #: ▮▮▮▮▮

**STATE OF CONNECTICUT,** Fairfield                    **County ss:** Shelton
The foregoing instrument was acknowledged before me this May 26, 2006

by _____

Johnny Ray Moore

My Commission Expires:

Notary Public  Alison Laroue
Commissioner of the
Superior Court

06992 0334

————————[Space Above This Line For Recording Data]————————

## INTEREST ONLY ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
ROMAN ALVAREZ

[Loan #]

    THIS INTEREST ONLY ADJUSTABLE RATE RIDER is made this TWENTY-SIXTH    day of
MAY, 2006    , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
73-75 BALDWIN STREET
BRIDGEPORT, CT 06607
[Property Address]

---

**MULTISTATE INTEREST ONLY ADJUSTABLE RATE RIDER - LIBOR INDEX**
  • BC - Interest Only ARM Rider                    Initials: 
2E121-XX (02/04)(d)           Page 1 of 3





06992    0335

LOAN #: ▮▮▮▮▮▮▮▮

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of     10.875  %. The Note provides for changes in
the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first                       day of
JUNE, 2008                , and on that day every sixth month thereafter. Each date on which my interest
rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45
days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
SEVEN & THREE-EIGHTHS        percentage point(s) (    7.375 %) to the Current Index.
The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate
until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay
the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest
rate in substantially equal payments. The result of this calculation will be the new amount of my monthly
payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than     12.375 %
or less than     10.875 %. Thereafter, my interest rate will never be increased or decreased on any
Change Date by more than single ONE & ONE-HALF                        percentage point(s)
(     1.500 %) from the rate of interest I have been paying for the preceding six months. My interest
rate will never be greater than     17.875  % or less than     10.875 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new
monthly payment beginning on the first monthly payment date after the Change Date until the amount of my
monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of
my monthly payment before the effective date of any change. The notice will include information required by
law to be given me and also the title and telephone number of a person who will answer any question I may
have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on the Note (the "First Principal and
Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

Initials: ▮▮▮▮

● BC - Interest Only ARM Rider
2E121-XX (02/04)                         Page 2 of 3

06992  0336

LOAN #: ▇▇▇▇▇▇▇

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Interest Only Adjustable Rate Rider.

_____ (Seal)
JOHNNY RAY MOORE                                                    - Borrower

_____ (Seal)
                                                                                   - Borrower

_____ (Seal)
                                                                                   - Borrower

_____ (Seal)
                                                                                   - Borrower

• BC - Interest Only ARM Rider
2E121-XX (02/04)                    Page 3 of 3

06992    0337

# 1-4 FAMILY RIDER
### (Assignment of Rents)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
ROMAN ALVAREZ

[Doc ID #]

THIS 1-4 FAMILY RIDER is made this TWENTY-SIXTH       day of MAY, 2006       ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
73-75 BALDWIN STREET
BRIDGEPORT, CT 06607
[Property Address]

1-4 **FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP -57R (0401).01     CHL (06/04)(d)     Page 1 of 3     Initials: _____
VMP Mortgage Solutions, Inc. (800)521-7291     **Form 3170 1/01**




06992    0338

DOC ID #:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and

Initials: _____

06992    0339

```
                                              DOC ID #: ███████████
```

maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
JOHNNY RAY MOORE                                 - Borrower

_____ (Seal)
                                                 - Borrower

_____ (Seal)
                                                 - Borrower

_____ (Seal)
                                                 - Borrower

BK          PG

06992      0340

### Schedule A

That certain piece or parcel of land situated in the City of Bridgeport, County of Fairfield, State of Connecticut, together with the buildings thereon standing, known as 75 Baldwin Street, Bridgeport, and being further described as follows:

NORTHERLY:  By land of B. Zeitlin, 100 feet;

EASTERLY:  By Baldwin Street, 40 feet;

SOUTHERLY:  By land of Kuruc and others, 100 feet;

WESTERLY:  By land of Pressman, 40 feet.

BRIDGEPORT, CONN.
LAND RECORDS
REC'D FOR RECORD FILED
5-31-06 AT 11:45 AM
ATTEST:
HECTOR DIAZ, TOWN CLERK

BK: 8549 PG: 210
INST: 00003929

Recording Requested By:
Bank of America
Prepared By: Mary Ann Hierman
888-603-9011
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

Property Address:
73-75 Baldwin St
Bridgeport, CT 06607-1302
CTO-AAI                    2/4/2012

I hereby certify that this is a true copy of a document filed in the office of the Bridgeport Town Clerk and that the original document from which copy was made is recorded in Vol 8549 Pg. 210 in the Bridgeport Land Records.
Dated: 3/5/12
ATTEST: _____
ALMA L. MAYA, TOWN CLERK

MIN #: _____  This space for Recorder's use  MERS Phone #: 888-679-6377

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 1901 E Voorhees Street, Suite C, Danville, IL 61834 does hereby grant, sell, assign, transfer and convey unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWABS INC., ASSET-BACKED CERTIFICATES, SERIES 2006-12 whose address is 101 BARCLAY ST - 4W, NEW YORK, NY 10286 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Original Lender:        COUNTRYWIDE HOME LOANS, INC.
Borrower(s):            JOHNNY RAY MOORE
Date of Mortgage:       5/26/2006
Original Loan Amount:   $248,000.00

Recorded in Bridgeport Township, CT on: 5/31/2006, book 06992, page 0323 and instrument number 019009

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on 2/4/2012

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By: _____
Aida Duenas
Assistant Secretary

Witness: Mercedes Judilla        Witness: Youda Crain

State of California
County of Ventura

On Feb 4, 2012 before me, Eric Way, Notary Public, personally appeared Aida Duenas, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public:

ERIC T. WAY
Commission # 1835518
Notary Public - California
Los Angeles County
My Comm. Expires Feb 7, 2013



**SLS**

8742 Lucent Blvd., Suite 300
Highlands Ranch, CO 80129
1-800-315-4SLS (4757)

## ESCROW ACCOUNT DISCLOSURE STATEMENT

Loan Number: ▮▮▮▮▮▮
Statement Date: 08/09/16
Customer Care Number: 1-800-315-4757
Hours:
Monday through Friday 6:00 am to 6:00 pm MT
SLS accepts calls from relay services on behalf of hearing impaired borrowers

JOHNNY RAY MOORE
15 SACHEM DR
SHELTON CT 06484-1756

PROPERTY ADDRESS:
73-75 BALDWIN STREET
BRIDGEPORT, CT 06607

### ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT - ACCOUNT HISTORY

LOAN NUMBER: ▮▮▮▮      August 2016   THRU   July 2017                                    DATE: 08/09/16

PAST YEARS PAYMENT BREAKDOWN:
PRIN & INTEREST ....... 891.62
ESCROW PAYMENT ....... 777.62
SHORTAGE PYMT ....... 10.67
TOTAL PAYMENT: 1679.91

| MONTH | PAYMENTS TO ESCROW | | PAYMENTS FROM ESCROW | | | ESCROW BALANCE | |
|---|---|---|---|---|---|---|---|
|  | PROJECTED | ACTUAL | PROJECTED | DESCRIPTION | ACTUAL | REQUIRED | ACTUAL |
|  |  |  |  | STARTING BALANCE | | 2405.28 | 2155.75 |
| Aug 16 | 777.62 | 0.00 | 0.00 | | 0.00 | 3182.90 | 2155.75 LP |
|  | 0.00 | 788.29 E | 0.00 | | 0.00 | 3182.90 | 2944.04 E |
| Sep 16 | 777.62 | 0.00 | 0.00 | | 0.00 | 3960.52 | 2944.04 E |
|  | 0.00 | 788.29 E | 0.00 | | 0.00 | 3960.52 | 3732.33 E |
| Oct 16 | 777.62 | 0.00 | 0.00 | | 0.00 | 4738.14 | 3732.33 E |
| Nov 16 | 777.62 | 0.00 | 1700.00 | HOMEOWNERS | 0.00 | 3815.76 | 3732.33 E |
| Dec 16 | 777.62 | 0.00 | 0.00 | | 0.00 | 4593.38 | 3732.33 E |
| Jan 17 | 777.62 | 0.00 | 3815.76 | CTY,TWN,VLLGE,T | 0.00 | 1555.24 | 3732.33 E |
| Feb 17 | 777.62 | 0.00 | 0.00 | | 0.00 | 2332.86 | 3732.33 E |
| Mar 17 | 777.62 | 0.00 | 0.00 | | 0.00 | 3110.48 | 3732.33 E |
| Apr 17 | 777.62 | 0.00 | 0.00 | | 0.00 | 3888.10 | 3732.33 E |
| May 17 | 777.62 | 0.00 | 0.00 | | 0.00 | 4665.72 | 3732.33 E |
| Jun 17 | 777.62 | 0.00 | 0.00 | | 0.00 | 5443.34 | 3732.33 E |
| Jul 17 | 777.62 | 0.00 | 3815.76 | CTY,TWN,VLLGE,T | 0.00 | 2405.20 | 3732.33 E |
| TOTALS | 9331.44 | 1576.58 | 9331.52 | | 0.00 | | |

(P) ACTUAL PAYMENTS TO ESCROW ARE DESIGNATED AS MONTHLY PAYMENTS.
(IOE) INTEREST PAYMENTS ON THE ESCROW BALANCE.
(*) INDICATES A DIFFERENCE IN EITHER THE AMOUNT OR DATE OF THE ANTICIPATED PAYMENTS TO OR FROM ESCROW AND THE ACTUAL PAYMENTS TO OR FROM ESCROW.
(E) INDICATES AN ESTIMATED PAYMENT.

LAST YEAR, WE ANTICIPATED THAT PAYMENTS FROM YOUR ESCROW ACCOUNT WOULD BE MADE DURING THIS PERIOD EQUALING $9331.52. UNDER FEDERAL LAW, YOUR ACTUAL LOWEST MONTHLY BALANCE (LP) SHOULD NOT HAVE EXCEEDED $1555.24 OR 1/6 OF THE ANTICIPATED PAYMENTS FROM YOUR ESCROW ACCOUNT UNLESS YOUR MORTGAGE DOCUMENTS OR STATE LAW SPECIFIES A LOWER AMOUNT.  YOUR ACTUAL LOWEST ESCROW BALANCE WAS $2155.75.
THE INFORMATION PROVIDED DOES NOT REQUIRE ANY ACTION ON YOUR PART. IF YOU HAVE ANY QUESTIONS, PLEASE CALL OUR TOLL FREE NUMBER 1-800-315-4757.

### ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT - PROJECTIONS

LOAN NUMBER: ▮▮▮▮      October 2016   THRU   September 2017                                    DATE: 08/09/16

PLEASE REVIEW THIS STATEMENT CLOSELY - YOUR MORTGAGE PAYMENT MAY BE AFFECTED.
Please retain this statement for comparison with the actual activity in your account at the end of the next escrow accounting computation year.

------------PROJECTED  ESCROW  DISBURSEMENTS------------
HOMEOWNERS ....... 1700.00
CTY,TWN,VLLGE,T ....... 7618.32
TOTAL PROJECTED ESCROW DISBURSEMENTS: 9318.32   ESCROW PAYMENT CALCULATION:  9318.32 / 12 =  776.52

(Continued on Reverse side of Page)

Specialized Loan Servicing LLC
P.O. Box 636005
Littleton, CO 80163-6005

### SHORTAGE  ADJUSTMENT NOTIFICATION

LOAN NUMBER: ▮▮▮▮▮▮
STATEMENT DATE:  08/09/16

**SHORTAGE  AMOUNT**
**$-223.79**

DO NOT REMIT ANY SHORTAGE  AMOUNT  WITH YOUR REGULAR PAYMENT.  YOUR SHORTAGE  AMOUNT SHOULD BE REMITTED WITH THIS COUPON ONLY.

Specialized Loan Servicing LLC
P.O. Box 636005
Littleton, CO 80163-6005

ESCROW $_____

75-75 BALDWIN STREET
BRIDGEPORT, CT 06607

**NAME:** Johnny Ray Moore

Continue of Account: ▓▓▓▓▓▓▓
For ESCROW DISCLOSURE STATEMENT

| MONTH | TO ESCROW | FROM ESCROW | DESCRIPTION | REQUIRED | PROJECTED |
|-------|-----------|-------------|-------------|----------|-----------|
| | | | STARTING BALANCE | 3956.12 | 3732.33 |
| Oct  16 | 776.52 | 0.00 | | 4732.64 | 4508.85 |
| Nov  16 | 776.52 | 1700.00 | HOMEOWNERS | 3809.16 | 3585.37 |
| Dec  16 | 776.52 | 0.00 | | 4585.68 | 4361.89 |
| Jan  17 | 776.52 | 3809.16 | CTY,TWN,VLLGE,T | 1553.04 | 1329.25 |
| Feb  17 | 776.52 | 0.00 | | 2329.56 | 2105.77 |
| Mar  17 | 776.52 | 0.00 | | 3106.08 | 2882.29 |
| Apr  17 | 776.52 | 0.00 | | 3882.60 | 3658.81 |
| May  17 | 776.52 | 0.00 | | 4659.12 | 4435.33 |
| Jun  17 | 776.52 | 0.00 | | 5435.64 | 5211.85 |
| Jul  17 | 776.52 | 3809.16 | CTY,TWN,VLLGE,T | 2403.00 | 2179.21 |
| Aug  17 | 776.52 | 0.00 | | 3179.52 | 2955.73 |
| Sep  17 | 776.52 | 0.00 | | 3956.04 | 3732.25 |
| **TOTALS** | **9318.24** | **9318.32** | | | |

CUSHION SELECTED BY SERVICER: 1553.04

YOUR ENDING ESCROW BALANCE FROM THE LAST MONTH OF THE ACCOUNT HISTORY IS $3732.33, YOUR STARTING BALANCE
ACCORDING TO THIS ANALYSIS SHOULD BE $3956.12. THIS MEANS THAT AS OF THE EFFECTIVE DATE OF YOUR NEW PAYMENT, YOU
WILL HAVE A SHORTAGE OF $-223.79.

PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE NEXT ESCROW
ACCOUNTING COMPUTATION YEAR.

BELOW IS YOUR NEW MONTHLY PAYMENT BREAKDOWN FOR THE NEXT 12 MONTHS EFFECTIVE 10/01/16

| | |
|---|---|
| PRIN & INTEREST | 891.62 |
| ESCROW PAYMENT | 776.52 |
| SHORTAGE PYMT | 10.17 |
| TOTAL | 1678.31 |

## Escrow Overview

If you have an escrow account, it means that part of your monthly mortgage payment goes into an account to pay for your property taxes and/or
insurance premiums. During the year, payments are made from your escrow account when tax and/or insurance bills become due. The Escrow Account
Disclosure Statement shows how much money has been credited to and paid from the escrow account over the last 12 months. Additionally, both the
projected and required balances are compared to insure that we are collecting the appropriate amount.

If there is too much money in your escrow account (a surplus), and your loan payments are current, we will credit you as follows: *

- Surplus of $50.00 or more- a refund check is attached to this statement
- Surplus of less than $50.00-your monthly payments are lowered accordingly

*If your property is in MD or NV and you have a surplus in your escrow account: The guidelines above will automatically be followed. However, you may
select one of the following options for handling your surplus: 1) you may request a refund of the surplus regardless of the amount, 2) you may apply the
surplus toward a loan payment or 3) you may leave the surplus in your escrow account.

If there is too little money in your escrow account (a shortage), we will adjust your payment to make up the difference. Increases in your property taxes or
insurance premiums are the most common cause of a shortage in your escrow account. The shortage will be adjusted by (1/22) of the shortage amount
and added to your monthly payment unless the full shortage is paid within 30 days. If you pay the shortage in full, please send a written request for a new
escrow analysis. A new analysis with updated payment information will be sent to you.

If you are being notified of an escrow shortage and monthly payment increase and are unable to afford your new monthly payment, please contact
Customer Care immediately at 1-800-315-4757, Monday through Friday, 8:00 a.m. until 5:00 p.m. MT. There may be other options available to assist you.

**BANKRUPTCY NOTICE - IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE
OF THIS DEBT: PLEASE BE ADVISED THAT THIS NOTICE IS TO ADVISE YOU OF THE STATUS OF YOUR MORTGAGE LOAN. THIS NOTICE
CONSTITUTES NEITHER A DEMAND FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY TO ANY RECIPIENT HEREOF, WHO MIGHT
HAVE RECEIVED A DISCHARGE OF SUCH DEBT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY LAWS OR WHO MIGHT BE SUBJECT
TO THE AUTOMATIC STAY OF SECTION 362 OF THE UNITED STATES BANKRUPTCY CODE. HOWEVER, IT MAY BE A NOTICE OF
POSSIBLE ENFORCEMENT OF THE LIEN AGAINST THE COLLATERAL PROPERTY, WHICH HAS NOT BEEN DISCHARGED IN YOUR
BANKRUPTCY. IF YOU HAVE QUESTIONS, PLEASE CONTACT US AT 1-800-306-6057.**

# EXHIBIT B

This document was prepared by
Home Retention Services, Inc.,
Modifications Department
9700 Bissonnet Street
Suite 1500
Houston, TX 77036
1.877.422.1761

_____ *SPACE ABOVE THIS LINE FOR RECORDER'S USE* _____

# LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), effective on the date set forth below, between Johnny Ray Moore, (the "Borrower(s)") and Bank of America, N.A. ("Lender") amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the 26 day of May, 2006 and in the amount of $248,000.00, and (2) the Note bearing the same date as, and secured by, the Security Instrument (the "Note") which covers the real and personal property described in the Security Instrument and defined therein as in the "Property", located at 73-75 Baldwin Street, Bridgeport, CT 06607.

If my representations in Section 1 below continue to be true in all material respects, then this Modification Agreement ("Agreement") will, as set forth in Section 3 below, amend and supplement (1) Security Instrument on the Property and (2) the Note secured by the Security Instrument, and any previous modifications to the Security Instrument and/or Note. The Security Instrument and Note together, as they may previously have been amended, are referred to as the "Loan Documents". Capitalized terms used in this Agreement and not defined here have the meaning given to them in the Loan Documents.

I have received three copies of this Agreement. After I sign and return two copies of this Agreement to Lender, I will retain the other copy for my records. This Agreement will not take effect unless the preconditions set forth in Section 2 below have been satisfied.

**1.** **My Representations and Covenants.** I certify, represent to Lender, covenant and agree:

BAC MODIFICATION AGREEMENT
(C3 3477 rev. 12/12) Bank of America, N.A.

C3 3477-3B

I am experiencing a financial hardship, and as a result, (1) I am in default under the Loan Documents or my default is imminent, and (2) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future.

A.    The property is currently occupied and there has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow.

B.    I have provided documentation for **all** income that I receive that I am required to disclose, and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for this Loan Modification ("Modification").

C.    Under penalty of perjury, all documents and information that I (or any third party on my behalf) have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Modification, are true and correct to the best of my information and belief.

D.    I have made all payments required under a trial period plan or loan workout plan.

2.    **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

A.    If prior to the Modification Effective Date as set forth in Section 3 below, Lender determines that any of my representations in Section 1 above are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In that event, Lender will have all of the rights and remedies provided by the Loan Documents; and

B.    I understand that the Loan Documents will not be modified unless and until (1) I return a signed and notarized (if required) copy of this Agreement to Lender, (2) the Lender accepts this Agreement by signing it, (3) and for borrowers in active bankruptcy, the bankruptcy court approves it, and (4) the Modification Effective Date (as defined in Section 3 below) has occurred.

3.    **The Modification. If** all of my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 above have been met, the Loan Documents will automatically become modified on August 01, 2013 (the "Modification Effective Date").

BAC MODIFICATION AGREEMENT
(C3 3477 rev 12/12) Bank of America, N.A.

C3 3477-3B

A.      As part of this Modification, I agree that all amounts and arrearages that are or will be
        past due as of the Modification Effective Date, including unpaid and deferred interest,
        fees, charges, escrow advances, and other costs, but excluding unpaid late charges,
        (collectively "Unpaid Amounts") less any amounts paid to Lender but not previously
        credited to my Loan, will be added to the current principal balance of the Note. This
        combined principal balance will be $412,240.46 (the "Combined Principal Balance"). I
        understand that by agreeing to add the Unpaid Amounts to the outstanding principal
        balance, the added Unpaid Amounts accrue interest based on the interest rate in effect
        under this Agreement unless those amounts are either deferred as non-interest bearing
        or forgiven as specified in this Agreement.

B.      $322,086.01 of the Combined Principal Balance is hereby permanently forgiven, and will
        be deducted from the unpaid principal balance. I further acknowledge that Lender may be
        required to report the amount of principal forgiveness to the IRS and that any tax liability
        arising out of that forgiveness shall be my responsibility. I further acknowledge that
        Lender has recommended that I consult my own tax advisor to determine how this
        forgiveness impacts my personal situation.

C.      As of the Modification Effective Date the principal balance of the loan that remains due
        and payable is $90,154.45 (the "New Principal Balance").

D.      Interest at the rate of 10.87% will begin to accrue on the New Principal Balance as of July
        01, 2013 and the first new monthly payment on the New Principal Balance will be due on
        August 01, 2013. My payment schedule for the modified Loan is as follows:

BAC MODIFICATION AGREEMENT - Single Family 5/38 and Conventional
(C3 3477 rev. 12/12) Bank of America, N.A.                    (Page 1 of 7 page)

C3_3477-3B

| Months | Interest Rate | Type of Payment | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On |
|--------|---------------|-----------------|-----------------------------------------------|-------------------------------------------|------------------------|-------------------|
| 275 | 10.87% | Principal and Interest | $891.62 | $839.63 May adjust periodically | $1,731.25 May adjust periodically | 08/01/2013 |

    *    If escrow payments are collected by Lender, Lender may adjust such payments periodically in accordance with applicable law. Therefore, my total monthly payment may change accordingly.

The terms in this Section 3.D. supersede any provisions to the contrary in the Loan Documents, and previous loan modifications including (but not limited to) provisions for an adjustable or interest-only rate.

E.    I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

4.    **Additional Agreements**. Lender and I agree to the following:

A.    All persons, or their authorized representative(s), who signed the Loan Documents have signed this Agreement, unless (1) a borrower or co-borrower is deceased; (2) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, meaning that the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (3) Lender has waived this requirement in writing. This Agreement may be executed in separate counterparts, each of which shall be deemed an original.

B.    This Agreement supersedes the terms of any modification, forbearance, trial period plan, or loan workout plan that I previously entered into with Lender.

C.    I will comply, except to the extent that they are modified by this Agreement, with all

BAC MODIFICATION AGREEMENT — Single Family — Fannie Mae/Freddie Mac Uniform Instrument
(C3_3477 rev. 12/12) Bank of America, N.A.    Page 6 of 11 pages

C3_3477-3B

covenants, agreements, and requirements of the Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments, the amount of which may periodically change over the term of my Loan.

D.      The Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

E.      All terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. Except as otherwise specifically provided in, and as expressly modified by, this Agreement, Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

F.      I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items". I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.F. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may

BAC MODIFICATION AGREEMENT
(C3  3477 rev. 12/12) Bank of America, N.A.

C3  3477-3B

revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.F.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

G.    On and after the Modification Effective Date, and notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, Lender shall not exercise this option if state or federal law, rules, or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Security Instrument. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand, to the extent such action is not prohibited by applicable state and federal law.

H.    On and after the Modification Effective Date, Lender will allow the transfer and assumption of the Loan, including this Agreement, only to a transferee of my property as permitted under the Garn-St Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.    On and after the Modification Effective Date, any provision in the Note (or in any addendum or amendment to the Note) that allowed for the assessment of a penalty for full or partial prepayment of the Note, is null and void.

J.    I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by Lender's procedures to ensure that the modified mortgage loan is in first-lien position

BAC MODIFICATION AGREEMENT - Single Family/Fannie Mae Uniform Instrument
(C3 3477 rev. 12-12) Bank of America, N.A.                                            Page 2 of 5 pages

C3 3477-3B

and/or is fully enforceable upon modification. Under any circumstance and not withstanding anything else to the contrary in this Agreement, if Lender does not receive such title endorsement(s), title insurance product(s), and/or subordination agreement(s), the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void. I will allow Lender to attach an Exhibit to this Loan Modification that will include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk's Office to allow for recording if and when recording becomes necessary for Lender.

K.    I will execute such other documents as may be reasonably necessary either to (1) consummate the terms and conditions of this Agreement; or (2) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. If I elect not to sign any such correction documents, the terms of the original Loan Documents, or the most recent modified terms currently in effect, shall, at Lender's sole option, continue in full force, and the terms of the original Loan Documents, or the most recent modified terms currently in effect, will not be modified by this Agreement.

L.    Any optional product(s) I may have purchased after the closing of my Loan, the cost for which I agreed to have added to my Total Monthly Payment, will (1) remain in force as long as I add the amount due and owing to my Total Monthly Payment each month and (2) continue to be governed by the terms of the documents the provider of the optional product delivered to me ("Governing Documents"), unless I (a) notify the provider of the optional product of my request to cancel; or (b) fail to pay any and all amounts payable when due, at which time the optional product may terminate as provided under the Governing Documents. If I have questions about any optional product(s) I may have purchased, I should contact Bank of America, N.A.

M.    I agree and consent to the disclosure of my personal information and the terms of this Modification Agreement by Lender or its agents to (a) governmental authorities, including the U.S. Department of the Treasury and Department of Justice, and their agents, (b) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services this Loan or any subordinate lien on the Property; (c) companies that perform support services in conjunction with this Modification and (d) any HUD-certified housing counselor.

BAC MODIFICATION AGREEMENT   single Fixed 7.0.2 (adj. amp. mod.)
(C3  3477 rev. 12/12) Bank of America, N.A.                                                  Page 4 of 13 eg. 4

C3  3477-39

If you are currently in a bankruptcy proceeding, or have previously obtained a discharge of this debt under applicable bankruptcy law, this notice is for information only and is not an attempt to collect the debt, a demand for payment, or an attempt to impose personal liability for that debt. You are not obligated to discuss your home loan with us or enter into a loan modification or other loan-assistance program. You should consult with your bankruptcy attorney or other advisor about your legal rights and options.

If you are currently in a bankruptcy proceeding, approval of any program for which you may be eligible is contingent on approval by the bankruptcy court in your bankruptcy case.

BAC MODIFICATION AGREEMENT
(C3_3477 rev. 12/12) Bank of America, N.A.

C3_3477-3B

As evidenced by their signatures below, the Borrower and the Lender agree to the foregoing.

_____                         _____
Borrower  Johnny Ray Moore                              Date   July 12, 2013


_____                         _____
Borrower                                                Date


BAC MODIFICATION AGREEMENT
(C3_3477 rev. 12/12) Bank of America, N.A.

C3_3477-3B

**DO NOT WRITE BELOW THIS LINE**

THIS SECTION IS FOR INTERNAL USE ONLY

**Bank of America, N.A., for itself or as successor by merger to BAC Home Loans Servicing, LP**

By: Stewart Lender Services, Inc., its attorney in fact

By: _____     _____
                                                  Date

_____, Stewart Lender Services, Inc.

BAC MODIFICATION AGREEMENT
(C3  3477 rev. 12/12) Bank of America, N.A

CS  3477-3B

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
### Bridgeport Division

IN RE:                                                    CHAPTER 13

Johnny Ray Moore a/k/a Johnny R. Moore,

            DEBTOR                              CASE NO. 16-51133

Specialized Loan Servicing, LLC, as servicer for
Bank of New York Mellon f/k/a The Bank of New
York, as Trustee for the Certificateholders of
CWABS, Inc., Asset-Backed Certificates,
Series 2006-12,

            MOVANT

VS

Johnny Ray Moore a/k/a Johnny R. Moore,

            DEBTOR

Molly T. Whiton, TRUSTEE

            RESPONDENT

## CERTIFICATE OF SERVICE

      Michael Rozea, states that he is over eighteen (18) years of age and resides in Long

Island, New York, and that on April 24, 2017, the undersigned served the following documents:

## REPLY TO DEBTOR'S OBJECTION TO CLAIM 14

by depositing a true copy thereof, properly enclosed in a securely closed and duly postpaid
wrapper in a depository regularly maintained by the United States Postal Service in the City of
New York, New York, directed as follows:

**Johnny Ray Moore**
15 Sachem Drive
Shelton, CT 06484

**Molly T. Whiton**
10 Columbus Boulevard
Hartford, CT 06106

**Office of the U.S. Trustee**
Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on April 24, 2017.

_/s/ Michael Rozea_
Michael Rozea